1  Marc K. Callahan (State Bar No. 156616)
2  John A. Vogt (State Bar No. 198677)
   JONES DAY
3  3161 Michelson Drive
4  Suite 800
   Irvine, CA  92612.4408
5  Telephone:  +1.949.851.3939
6  Facsimile:   +1.949.553.7539
   Email:  javogt@jonesday.com
7
8  Geoffrey K. Beach (Admitted *Pro Hac Vice*)
   Howell A. Burkhalter (Admitted *Pro Hac Vice*)
9  WOMBLE CARLYLE SANDRIDGE & RICE LLP
10 One West Fourth Street
   Winston-Salem, NC  27101
11 Telephone:  (336) 721-3504
12 Facsimile:  (336) 733-8437
   Email:  hburkhalter@wcsr.com
13
14 Attorneys for Defendant
   R.J. REYNOLDS TOBACCO CO.
15

16
                   **UNITED STATES DISTRICT COURT**
17
              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
18

19 | AMANDA SATERIALE, et al., | Case No. CV 09 08394 CAS (SSx) |
20 | | |
   | Plaintiffs, | **R.J. REYNOLDS TOBACCO** |
21 | | **COMPANY'S MEMORANDUM** |
   | v. | **IN OPPOSITION TO MOTION** |
22 | | **FOR CLASS CERTIFICATION** |
23 | R.J. REYNOLDS TOBACCO CO., | |
   | | Date:  August 18, 2014 |
24 | Defendant. | Time: 10:00 a.m. |
   | | Courtroom: 5 |
25 | | Before:  Hon. Christina A. Snyder |
26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3

INTRODUCTION ........................................................................................... 1

4

STATEMENT OF FACTS ............................................................................. 7

5

6

    I.     OVERVIEW OF CAMEL CASH PROMOTIONS ........................... 7

7

    II.    THE FINAL CAMEL CASH PROMOTION ................................... 10

8

    III.   INDIVIDUAL FACT ISSUES ABOUND ....................................... 15

9

10

LEGAL ARGUMENT .................................................................................. 19

11

    I.     PLAINTIFFS LACK STANDING ................................................... 19

12

13

    II.    A CLASS MAY NOT BE CERTIFIED BASED UPON LEGAL THEORIES THAT WERE NEVER PLEADED .............................. 20

14

15

    III.   THE CLASS IS OVERBROAD AND NOT ASCERTAINABLE ........................................................................ 20

16

17

    IV.   PLAINTIFFS FAIL TO SATISFY RULE 23(A) .............................. 21

18

         A.   Plaintiffs Fail to Establish Numerosity .................................... 22

19

         B.   Plaintiffs Cannot Satisfy The Commonality Requirement ....... 22

20

         C.   Plaintiffs' Claims Are Not Typical ........................................... 24

21

    V.    PLAINTIFFS CANNOT SATISFY RULE 23(B)(3) ........................ 25

22

         A.   Individualized Issues of Fact Predominate ............................... 26

23

         B.   Varying State Laws Destroy Predominance, Manageability, and Superiority ................................................. 33

24

25

CONCLUSION ............................................................................................. 35

26

27

28

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

# TABLE OF AUTHORITIES

**Page**

**CASES**

*AAMCO Transmissions, Inc. v. Wirth*,
  2011 WL 6088671 (E.D. P.A. Dec. 7, 2011) .........................................35

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) ...............................................................4

*Alligood v. Procter & Gamble Co.*,
  594 N.E.2d 668 (Ohio Ct. App. 1991) .....................................................34

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .........................................................................19, 25

*Anderson v. U.S. Dep't of Hous. & Urban Dev.*,
  554 F.3d 525 (5th Cir. 2008).................................................................2, 20

*Bell v. Bimbo Foods Bakeries Distrib., Inc.*,
  2013 U.S. Dist. Lexis 170663 (N.D. Ill. Dec. 03, 2013)...........................20

*Beraha v. Baxter Health Care Corp.*,
  956 F.2d 1436 (7th Cir. 1992)..................................................................35

*Brill v. Catfish Shaks of Am., Inc.*,
  727 F. Supp. 1035 (E.D. La. 1989) ..........................................................35

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998).....................................................................26

*Brown v. American Airlines, Inc.*,
  285 F.R.D. 546 (C.D. Cal. 2011) ..........................................................1, 20

*Bushbeck v. Chi. Title Ins. Co.*,
  2011 U.S. Dist. LEXIS 158134 (W.D. Wash. Aug. 15, 2011) ...................29

*Campusano v. BAC Home Loans Servicing LP*,
  2013 WL 2302676 (C.D. Cal. Apr. 29, 2013)...........................................26

- ii -

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

# TABLE OF AUTHORITIES

**Page**

*Chin v. Chrysler Corp.*,
   182 F.3d 448 (D. N.J. 1998)..................................................................34

*Cholakyan v. Mercedes-Benz USA, LLC*,
   281 F.R.D. 534 (C.D. Cal. Mar. 28, 2012)......................................3, 25

*CLN Props., Inc. v. Republic Servs., Inc.*,
   2010 WL 5146734 (D. Ariz. Dec. 13, 2010)......................................29

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ...............................................5, 19, 26, 33

*CSI Elec. Contractors, Inc. v. Zimmer America Corp.*,
   2013 WL 1249021 (C.D. Cal. March 25, 2013) ....................................3

*Desai v. Deutsche Bank Secs., Inc.*,
   573 F.3d 931 (9th Cir. 2009)..................................................................31

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011)..................................................................24

*Evans v. IAC/Interactive Corp.*,
   244 F.R.D. 568 (C.D. Cal. 2007) .........................................................20

*Evans v. Linden Research, Inc.*,
   2012 WL 5877579 (N.D. Cal. Nov. 20, 2012)....................................19

*Gustafson v. BAC Home Loans Servicing, LP*,
   294 F.R.D. 529 (C.D. Cal. 2013) ...........................................6, 34, 35

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992).................................................................25

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3rd Cir. 2013)....................................................20, 21, 22

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

1

# TABLE OF AUTHORITIES

2

**Page**

3

*Herrington v. County of Sonoma,*

4

12 F.3d 901 (9th Cir. 1993) ................................................................. 1

5

*Home Electric Co. v. Hall & Underdown Heating & Air Conditioning*

6

*Co.,*

7

86 N.C. App. 540 (1987) .................................................................... 34

8

*In re LifeUSA Holding, Inc.,*

9

242 F.3d 136 (3d Cir. 2001) .............................................................. 25

10

*In Re Paxil Litigation,*

11

212 F.R.D. 539 (C.D. Cal. 2003) ................................................... 6, 33

12

*Lane v. Wells Fargo Bank, NA.,*

13

2013 WL 3187410 (N.D. Cal. June 21, 2013) ............................. 29, 35

14

*Leonard v. Pepsico, Inc.,*

15

88 F.Supp.2d 116 (S.D.N.Y. 1999) ................................................... 34

16

*Lierboe v. State Farm Mut. Auto Ins.,*

17

350 F.3d 1018 (9th Cir. 2003) ........................................................... 19

18

*Lozano v. AT&T Wireless Servs., Inc.,*

19

504 F.3d 718 (9th Cir. 2007) ............................................................. 28

20

*Lujan v. Defenders of Wildlife,*

21

504 U.S. 555 (1992) .......................................................................... 19

22

*Marlo v. United Parcel Serv., Inc.,*

23

639 F.3d 942 (9th Cir. 2011) ............................................................. 25

24

*Marsh v. First Bank of Delaware,*

25

2014 WL 554553 (N.D. Cal. Feb. 7, 2014) ....................................... 34

26

*Martin v. Dahlberg, Inc.,*

27

156 F.R.D. 207 (N.D. Cal. 1994) ...................................................... 32

28

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

# TABLE OF AUTHORITIES

**Page**

*Mazur v. eBay, Inc.*,
    257 F.R.D. 563 (N.D. Cal. 2009) ........................................................ 20

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) .................................................... 3, 5, 19

*O'Connor v. Boeing N. Am., Inc.*,
    197 F.R.D. 404 (C.D. Cal. 2000) ........................................................ 24

*Poulos v. Caesars World, Inc.*,
    379 F.3d 654 (9th Cir. 2004) ............................................................... 31

*Quezada v. Loan Center, Inc.*,
    2009 WL 5113506 (E.D. Cal. 2009) ......................................... 3, 5, 24

*Sateriale v. R.J. Reynolds Tobacco Co.*,
    697 F.3d 777 (9th Cir. 2012) ................................................... *passim*

*Schwartz v. Upper Deck Co.*,
    183 F.R.D. 672 (S.D. Cal. 1999) .............................................. 3, 21, 34

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ......................................................... 26

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ............................................................. *passim*

*Yarger v. ING Bank FSB*,
    285 F.R.D. 308 (D. Del. 2012) ................................................... 29, 35

*Zinser v. Accufix Research Institute, Inc.*,
    253 F.3d 1180 (9th Cir. 2001) .......................................................... 34

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

## INTRODUCTION

Realizing that they cannot certify a class based upon the narrow legal theory that the Ninth Circuit adopted, which is law of the case, *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993), plaintiffs belatedly attempt to amend their claims through a motion for class certification, which is improper. *Brown v. American Airlines, Inc.*, 285 F.R.D. 546, 560 (C.D. Cal. 2011) (denying class certification, and holding that "[c]lass certification is not a time for asserting new legal theories that were not pleaded in the complaint").

Plaintiffs' motion begins by presenting a new theory of contract formation. Because they admittedly did not "redeem[] their [Camel Cash] certificates in accordance with the catalogs' terms," *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 787 (9th Cir. 2012)—the performance the Ninth Circuit held was required to form a contract with Reynolds—plaintiffs attempt to replace *redemption* with *enrollment*: "Plaintiffs seek to represent a class of consumers who *accepted* RJR's offer by *enrolling* in the Camel Cash Program."[1] But as Fred Javaheri confirmed, enrollment is a fiction. ("Q.  Now, did you have to enroll into the Camel Cash program?  Is that something you had to do?  A.  No.")[2] Having eschewed the Ninth Circuit's opinion that the touchstone of their claims is *redemption* in accordance with the catalog, plaintiffs have not put forth an objective criteria by which to discern the members of the class they seek to represent.

Plaintiffs' motion also presents a new theory of breach.  Gone are plaintiffs twin allegations that, on October 1, 2006, Reynolds:  (1) "immediately ceased" accepting C-Notes for redemption for Camel Cash rewards; and (2) failed to make "<u>any</u>" rewards available.  So too is their admission that the contract was *not* for a

---

[1] Plaintiffs' Memorandum in Support of Motion to Certify Class (OB) at 1:12-13 (emphasis added).

[2] Declaration of John A. Vogt (Vogt Decl.) (filed in support of Reynolds' Motion for Summary Judgment) (Dkt. No. 91) Ex. 11 at 34:25-35:7; 102:11-14.

"specific item or good."   In their place, plaintiffs contend that, during the final promotion, Reynolds, in violation of the "covenant of good faith and fair dealing," supposedly "destroyed" their individual "expectations" by offering the wrong *types* of rewards (tobacco goods as opposed to "merchandise"). (OB at 1:14-17; 2:14-21.)

But plaintiffs knew—*before they filed suit*—that tobacco goods were the only type of reward that Reynolds offered during final Camel Cash promotion. (*See* OB at 14:8-16:9.)   Yet, *nowhere* in any version of their complaint do plaintiffs assert a breach based upon Reynolds' failure to meet their individual "expectations" over the *types* of rewards that were offered; instead, as they represented to the Ninth Circuit, plaintiffs' claim has always been that Reynolds failed to provide "any" rewards.  (TAC, ¶ 4.)   This change of theory precludes class certification. *Anderson v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 525, 529 (5th Cir. 2008) ("The district court's authority to certify a class under Rule 23 does not permit it to structure a class around claims not pled.").

Even assuming the Court could entertain plaintiffs' unpleaded theories, they pose an intractable problem on class certification:   The very nature of the claims preclude class certification.   The key assumption underlying plaintiffs' new theory is that had Reynolds, in the final promotion, offered the same types of rewards that were made available in earlier promotions, the entire class would have participated. But hundreds of thousands of persons holding Camel Cash had stopped participating in the prior five years when promotions offered the types of rewards plaintiffs now contend that Reynolds should have continued to offer in the final promotion.   Reynolds' research also indicated that these inactive participants were unlikely to participate in the future (because, for example, they stopped smoking). It was this low participation that led Reynolds to discontinue Camel Cash promotions.   Plaintiffs do not, and cannot, propose an *objective criteria* to distinguish those who did not participate in the final promotion because of the types of rewards offered, from those who had simply dropped out (or those who did not

1    participate for other reasons, such as not having enough C-Notes).  The only way to
2    determine whether someone would have participated in the final promotion had
3    Reynolds offered different types of rewards would be to ask them—an individual
4    inquiry that precludes class certification.  *Schwartz v. Upper Deck Co.*, 183 F.R.D.
5    672, 667 (S.D. Cal. 1999) (subjective intent incapable of class wide treatment).

6        Lacking an objective criteria, plaintiffs propose that the class be limited to
7    those who "enrolled in Camel Cash . . . so they could redeem C-Notes for [non
8    tobacco] merchandise."  (OB 3:10-14.)   But this criteria, as plaintiffs admit, is a
9    fiction.  Even the faux enrollment would not indicate whether consumers did so in
10   order to obtain a particular type of reward.  Ironically, the only manifestation on the
11   part of a consumer that would objectively indicate that they were participating in a
12   Camel Cash promotion would be the submission of an order form with C-Notes for
13   rewards.  That criteria is the touchstone of the Ninth Circuit's decision, and a
14   criteria that plaintiffs admittedly cannot satisfy.

15       There are scores of other reasons why a class cannot be certified:

16   •      Absent a contract, the implied covenant cannot be invoked.  *CSI Elec.*
17   *Contractors, Inc. v. Zimmer America Corp.*, 2013 WL 1249021, at * 4 (C.D. Cal.
18   March 25, 2013) ("'There is no obligation to deal fairly or in good faith absent an
19   existing contract.'") (citation omitted).   But because plaintiffs did not redeem C-
20   Notes in accordance with the catalog's terms, they did not form a contract and,
21   hence, cannot invoke the implied covenant, which precludes Article III standing,
22   *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012), and subjects
23   them to unique defenses that preclude class certification.  *Quezada v. Loan Center,*
24   *Inc.*, 2009 WL 5113506, at * 3 (E.D. Cal. 2009).  It also renders plaintiffs atypical
25   of thousands that did redeem C-Notes during the final promotion.  *Cholakyan v.*
26   *Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 556 (C.D. Cal. Mar. 28, 2012).

27   •      Their new theory—that individuals wanted "merchandise" instead of
28   tobacco goods—is incapable of generating "common answers apt to drive the

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Five out of the seven plaintiffs testified that they viewed tobacco goods to be "merchandise."  ("Q.  Now, you understand that throughout the Camel Cash program, one of the items of *merchandise* that Reynolds offered was cigarettes, true?  A.  Yes.")[3]  In other words, plaintiffs' new theory that Reynolds failed to provide "merchandise" during the final promotion is doomed by the testimony of the named plaintiffs. ("Q. [A]re you aware of any facts to say that, as of October 1st, 2006, my client failed to provide any merchandise?  A.  No.")[4]

•      The determination of whether Reynolds failed to meet individual "expectations" over the *type* of merchandise that was offered during the final promotion, short of individualized inquiry, would be impossible.   This is so because, while plaintiffs may not have personally preferred tobacco merchandise as a type of Camel Cash reward, they readily admit that others would:

> Q.    So just because you personally may not have
> wanted to redeem your C-Notes for cigarettes does not
> mean that other people that participated in the program
> felt the same way, true?
> A.    True.  []
> Q.    It's an individual issue, true?
> A.    Exactly.[5]

That clearly is the case for the individuals that participated in the final Camel Cash promotion, obtained rewards, and derived a benefit from the promotion. "[N]o circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class[.]" *Allied Orthopedic Appliances, Inc. v. Tyco*

---

[3] Vogt Decl., Ex. 5 at 21:3-6 (emphasis added).

[4] *Id*., Ex. 6 at 84:25-85:3.

[5] Vogt Decl., Ex. 6 at 56:14-58:10; *id*., Ex. 7 at 52:21-53:10 (same).

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

1  *Healthcare Grp. L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007).

2      •     Plaintiffs also have not come forward with evidence to substantiate

3  that every member of the putative class was actually exposed to the same set of

4  communications so as to be able to form a common "expectation" as to the types of

5  rewards Reynolds would offer.  On the contrary, the evidence shows that, even

6  among the named plaintiffs, there was not receipt of common communications.

7  Some plaintiffs saw "[m]aybe like three or four" Camel Cash catalogs in total.[6]

8  Many catalogs were unfamiliar to plaintiffs.  ("This one doesn't look familiar,

9  no." ... "Does not look familiar." ... "It doesn't look familiar." … "I only recognized

10  one out of the ten that you showed me.")[7]

11      •     In arguing that a common injury exists, plaintiffs contend that

12  Reynolds rendered C-Notes "worthless" when it offered only art packs and coupons

13  for cigarettes during the final promotion.  (OB at 13:16.)  Yet, to establish a

14  measure of damages for that claimed injury, plaintiffs contend that the $0.20 per

15  C-Note redemption value during the final promotion is an appropriate guidepost.

16  (*Id.* at 8:8-9.)  Obviously, if C-Notes were "worthless" during the final promotion,

17  they did not have *any* value.  And, because plaintiffs have failed to put forth an

18  alternative damages model—including one that excludes consumers that collected

19  C-Notes for tobacco merchandise—they have not carried their burden on class

20  certification.[8]  On the other hand, if, as plaintiffs claim, C-Notes had a redemption

21  value of $0.20 during the final promotion by virtue of the rewards Reynolds

22  offered, there is no basis for plaintiffs to claim that their C-Notes were "worthless,"

23  which:  (1) defeats the existence of *any*, much less a common, injury; and

24  (2) precludes Article III standing and class certification.  *Mazza*, 666 F.3d at 594.

25      [6] Vogt Decl., Ex. 6 at 28:13-21.

26      [7] Vogt Decl., Ex. 11 at 69:6; 70:1; 74:17; 89:1-3.

27      [8] *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (plaintiffs' failure
    to distinguish and link each liability theory and damages assessment rendered
28  predominance prerequisite a "nullity").

• Plaintiffs' new theory also would lead to absurdities. Because, as plaintiffs admit, an adult smoker needed at least 200 C-Notes to participate in the penultimate Camel Cash promotion (OB 5:7-9), someone that held 199 C-Notes on September 30, 2006 would not have had enough C-Notes to do so. In effect, those C-Notes were, indeed, *worthless* on that date. Yet, under plaintiffs' new theory, the very next day—*i.e.*, the day that Reynolds supposedly rendered all C-Notes "worthless"—those same 199 C-Notes, which had no value the day before, became worth $0.20 apiece. Given the foregoing, the class cannot include individuals that possessed less than 200 C-Notes on September 30, 2006. But short of mini-trials, ascertaining the names of individuals that held at least 200 C-Notes as of September 30, 2006, and desired non-tobacco items too, would be impossible.

• Where, as here, plaintiffs seek "certification of a nationwide class in which the laws of 50 states, rather than federal law, must be identified and applied," it is "the burden [of] plaintiffs to credibly demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles." *In Re Paxil Litigation*, 212 F.R.D. 539, 546 (C.D. Cal. 2003). Plaintiffs do not come close to meeting that burden. (*See* Section V (B), *infra*.)[9] A nationwide class, based upon the breach of an implied covenant, is incapable of being certified. *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 547-48 (C.D. Cal. 2013) (denying class certification on breach of implied covenant in nationwide class action, and cataloging the scores of other cases doing the same).

One final point bears emphasis. Plaintiffs imply that Reynolds was bent on "destroying" consumer expectations by offering only tobacco merchandise during the final promotion. The uncontroverted evidence proves the opposite. *Before* ending Camel Cash promotions, Reynolds conducted a consumer survey to determine, in part, what items of Camel Cash rewards adult smokers "would like to

---

[9] *See also* accompanying Declaration of Ann T. Rossum (Rossum Decl.), Exs. 1-4 [charts setting forth material differences among the laws of the 50 states].

receive from a future continuity program." The survey showed that "Cigarette products" were the single most desired item. The survey results are consistent with redemption statistics, with cigarette products being the second most popular item of rewards, and during the period January 1, 2006 through September 30, 2006, being chosen 3:1—*i.e.*, 75%—to other types of rewards. This fact was not surprising to the plaintiffs: "Smokers looking at getting free smokes. There you go."[10]

The motion for class certification should be denied.

## STATEMENT OF FACTS

## I.    OVERVIEW OF CAMEL CASH PROMOTIONS

Camel Cash was a series of promotions, each with pre-specified start and end dates, written terms and conditions, and unique rewards offered for redemption.[11] Each promotion had a catalog.[12] The catalogs contained all of the promotion's terms and conditions.[13] They also specified the rewards Reynolds offered and the number of C-Notes needed to obtain them.[14] Plaintiffs admit that in the penultimate Camel Cash promotion, an individual needed at least 200 C-Notes to participate. (*See* OB 5:7-9.) The catalogs also contained order forms on which a promotion's participant could select the rewards they wished to order.[15] None of the catalogs

---

[10] Vogt Decl., Ex. 6 at 56:22-23.

[11] Vogt Decl., Ex. 2 at 78:17-79:17; 84:19-85:11; *id*., Ex. 5 at 22:25-23:3; *id*., Ex. 6 at 45:4-6 ("Q.  Did you understand that each of the Camel Cash catalogs had a start date and an end date?  A. Yes."); Setchell Decl., ¶ 3.

[12] Declaration of Christy Canary-Garner (Canary-Garner Decl.) (filed in support of Reynolds' Motion for Summary Judgment) (Dkt. No. 92) ¶¶ 5 & 8; Vogt Decl., Ex. 2 at 84:19-85:11.

[13] Request for Judicial Notice (RJN) (filed in support of Reynolds' Motion for Summary Judgment) (Dkt. No. 93) Ex. 2 at 19 ("[e]very term of the contract was in writing . . ."); *id*. at 1 ("The Catalogs set forth all the Program's terms and conditions."); *id*. at 11 (same); Vogt Decl., Ex. 5 at 111:22-112:3 (same).

[14] Canary-Garner Decl., ¶¶ 5 & 8; Vogt Decl., Ex. 2 at 84:19-85:11.

[15] Vogt Decl., Ex. 2 at 84:19-85:11.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

stated that any particular types of rewards would be offered in the future.[16]

While some types of rewards were offered in more than one promotion, no two Camel Cash promotions were alike.[17]  The one and only type of reward that appeared in every promotion since 1998 were cartons of cigarettes and coupons for cigarettes.[18] On multiple occasions, Jackie Warren's husband, Bobby, redeemed C-Notes for cartons of Camel cigarettes, which she smoked.[19]  Five of the seven plaintiffs testified that cartons of cigarettes were one of the types of "merchandise" that Reynolds offered during Camel Cash promotions:

> Q.    So it's true, is it not, that *cigarettes were*
> *part of the merchandise* that Reynolds made available
> during the life of the Camel Cash program?
>
> A.    Yes. [20]

Plaintiffs also testified that cigarette coupons were a value to them, and that they had used coupons for cigarettes in the past.[21]

Plaintiffs admit that they were not entitled to specific items or goods; but instead, could tender C-Notes for "whatever rewards" that Reynolds chose to make available.  ("Q.  So your understanding at the time was that Reynolds did not have an obligation to make specific items or goods available, correct?  A.  Correct.")[22]

---

[16] *Id*. at 80:24-81:11.

[17] *Id*. at 80:24-81:11, 84:19-85:11.

[18] Canary-Garner Decl., ¶¶ 4-9, and Exs. 3-15.

[19] Vogt Decl., Ex. 5 at 20:19-25.

[20] *Id*. at 21:3-22:7 (objection omitted, emphasis added); *id*. at 150:13-151:1; *id*., Ex. 6 at 25:4-10, 50:14-21; *id*., Ex. 11 at 14:1-3, 163:25-165:05; *id*., Ex. 8 at 247:25-248:14; *id*., Ex. 9 at 51:18-52:11, 68:25-69:4.

[21] Vogt Decl., Ex. 9 at 42:5-12, 87:13-88:8; *id*., Ex. 10 at 68:3-68:9, 108:2-23; *id*., Ex. 8 at 86:15-87:8.

[22] Vogt Decl., Ex. 6 at 93:5-12; *see also id*., Ex. 5 at 129:1-14; TAC, ¶ 31; *see also Sateriale*, 697 F.3d at 788.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

Plaintiffs admit that Reynolds had discretion to choose the rewards to be offered. ("Q.  Reynolds had the discretion to choose which items or goods it was going to make available for redemption, true?  A.  True.")[23]  In their briefing to the Ninth Circuit, plaintiffs were adamant:  "Plaintiffs do not deny that RJR could select different products for redemption or alter the amount of C-Notes necessary for redemption."  (RJN, Ex. 1 at 54.)

Nor, did Reynolds promise plaintiffs, or anyone else, that the same merchandise would always be available as Camel Cash rewards.  ("Q.  Did RJR ever promise you that the same merchandise would always be available? A.  No.")[24]  Plaintiffs also concede that they could not redeem C-Notes for items in a catalog that had expired,[25] and they had no expectation about the types of rewards that Reynolds would offer in future promotions.[26]  Some plaintiffs acknowledge that they were not "induc[ed]" to "save C-Notes for longer periods of time so they could acquire more expensive merchandise," *see* OB at 3:25-27, because they never were promised that there would always be expensive items.  ("Q.  Did my client ever promise you that expensive items would always be available?  A.  No.").[27]

Nor, did plaintiffs "enroll" in the Camel Cash "program":  "Q.  Now, did you have to enroll into the Camel Cash program?  Is that something you had to do? [Objection omitted.]  A.  *No*."[28]  Yet, plaintiffs seek to represent and certify a class "of consumers who accepted RJR's offer by enrolling in the Camel Cash Program." As the accompanying Declaration of Joel Setchell makes clear, there was no

---

[23] *Id.*, Ex. 6 at 93:5-12.

[24] Vogt Decl., Ex. 5 at 23:15-17; *id.*, Ex. 6 at 59:1-3 (same).

[25] *Id.*, Ex. 5 at 23:8-10; *id.*, Ex. 6 at 45:7-10.

[26] *Id.*, Ex. 6 at 59:12-14.

[27] *Id.*, Ex. 6 at 59:4-6; *id.*, Ex. 5 at 24:22-25:4.

[28] Vogt Decl., Ex. 11 at 34:25-35:7; 69:6; 70:1; 74:17; 89:1-3; Setchell Decl., ¶ 4 (explaining that there was no "enrollment" into Camel Cash promotions).

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

"enrollment" process into any Camel Cash promotion.   (Setchell Decl., ¶ 4.)
Instead, to be eligible to participate in a Camel Cash promotion, an adult smoker
had to register with Reynolds' direct marketing database by attesting to the fact that
he or she was an existing adult smoker, of legal age, who wished to receive offers
and communications from Reynolds, and by providing various other information,
such as their name, address, and birth date.  (*Id*.)  Of the approximately 13 million
adult smokers registered in Reynolds' smoker database, about 600,000 indicated
that they preferred Camel cigarettes to other brands—not that they "enrolled" in
Camel Cash.  (*Id*., ¶ 5.)  As such, it includes hundreds of thousands of persons who
never participated in any Camel Cash promotion, or were no longer participating in
the promotion at the time of the final Camel Cash promotion, or never did so.  (*Id*.)

While plaintiffs incorrectly assert that "the class is adequately defined and
ascertainable [because] RJR's corporate records identify approximately 600,000
individuals, with contact information, who enrolled in the Program," *see* OB at
11:23-25, they have not come forward with an objective criteria to determine which
of those 600,000 individuals had C-Notes at any time, much less possessed them on
October 1, 2006, and intended to participate in the final Camel Cash promotion, but
failed to do so, for reasons consistent with plaintiffs' ever-shifting legal theories.

## II.   THE FINAL CAMEL CASH PROMOTION

The final Camel Cash promotion ran from October 1, 2006 to
March 31, 2007.  At the start of the final promotion, all prior Camel Cash
promotions had expired—*i.e.*, the offers contained in the catalogs applicable to
those promotions had ended, and adult smokers were no longer permitted to order
the rewards offered in those promotions.[29]

Before announcing that Camel Cash promotions were ending, Reynolds, in

---

[29] Vogt Decl., Ex. 2 at 78:12-79:17; *id*., Ex. 5 at 23:8-10 ("Q.  Did you expect
to be able to order items from a catalog that had expired?  A.  No."); *id*., Ex. 6
at 45:7-10 (same); Canary-Garner Decl., ¶ 9.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

December 2005, commissioned a survey to evaluate the Camel Cash continuity promotions.[30]   The survey showed that 80% of adult smokers that previously had redeemed C-Notes held less than 1000 C-Notes, and 30% held less than 100 C-Notes.[31]   The survey also revealed that, to date, the second most popular item of Camel Cash rewards was "Carton of cigarettes."[32]   The survey further showed that "Cigarette products" were the single most desired item that adult smokers "would like to receive from a future continuity program."[33]   The survey also indicated that less than 9% of inactives were likely to participate in the future.[34] In fact, plaintiffs assert that most C-Notes (60%) were never going to be redeemed regardless of the types of rewards Reynolds offered.[35]   The survey is validated by the redemption statistics, which show that only 142,000 adult smokers redeemed C-Notes between January 2002 and September 2006—*i.e.*, a period of time when Reynolds offered both tobacco and non-tobacco merchandise as rewards—which is less than 2% of Reynolds active mailing list.[36]

---

[30] *See* Supplemental Declaration of Christy Canary-Garner (Corrected Canary-Garner Decl.) (Dkt. No. 98) ¶ 2 and Ex. 16, which was filed in support of Reynolds' Motion for Summary Judgment.

[31] *Id*., Ex. 16 at 17; Vogt Decl., Ex. 2 at 107:15-108:20.

[32] Corrected Canary-Garner Decl., Ex. 16 at 18; Vogt Decl., Ex. 2 at 108:21-109:20.

[33] Supplemental Canary-Garner Decl., Ex. 16 at 40; Vogt Decl., Ex. 2 at 108:21-109:20. The survey results are confirmed by the redemption statistics, with cigarettes being the most popular item of Camel Cash rewards by an order of magnitude of 3:1 during the period January 1, 2006 through September 30, 2006. (*See* Setchel Decl., ¶ 13.)

[34] Supplemental Canary-Garner Decl., Ex. 16 at 48-50; Vogt Decl., Ex. 2 at 94:17-100:23.

[35] Declaration of Jeffrey Squire (Squire Decl.), Ex. E at 281.

[36] Vogt Decl., Ex. 3 at 80:12-83:8.  Plaintiffs claim that an "Exit Survey" of 1,144 consumers reveals that 85.5% of respondents were saving C-Notes and approximately 55% had been saving five years or more.  (OB at 5:18-6:1.)  Not so. (Setchell Decl., ¶ 15.) Only 488 people responded to the question about saving C-

11

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

Reynolds provided notice that Camel Cash promotions were ending.  (OB, at 9 n. 16 (acknowledging this as an "undisputed fact").)  Beginning in late-August of 2006, Reynolds notified consumers of this decision through direct mail, e-mail, telephone calls, and on the Camel brand website (where Reynolds posted the notice).[37]  Notwithstanding this notice, *none* of the plaintiffs redeemed C-Notes for Camel Cash rewards—including the non-tobacco merchandise that was offered—in the month preceding the final promotion.

The Camel brand website published the final promotion's terms and conditions, as well as an order form, which could be printed off the website.[38] The terms and conditions stated, among other things, that completed order forms must be received by April 12, 2007, and the "Camel Cash Program and C-Notes in all versions expire March 30th, 2007." (*Id*.)  The terms and conditions of the final promotion, like every other Camel Cash promotion since 2001, stated: The "Program and/or offer(s) subject to change/termination without notice."[39]

During the final Camel Cash promotion, Reynolds offered:  (i) cigarettes in specially designed packaging (art packs) worth 125 C-Notes; and $5.00 coupon books for cigarettes worth 250 C-Notes.[40]  Thus, only individuals that held at least 125 C-Notes could have participated in the final promotion, which a lower

---

(continued…)

Notes, of which:  (i) 417 said they were saving C-Notes; and (ii) 229 said they had been saving for 5 years or longer.  (*Id*.)  Thus, only 36.5% of those surveyed reported saving C-Notes, and only 20% did so for more than 5 years.

[37] Vogt Decl., Ex. 2 at 94:17-100:23; Setchell Decl., ¶ 9.

[38] Vogt Decl., Ex. 2 at 102:03-104:21; Canary-Garner Decl., Ex. 15.

[39] Vogt Decl., Ex. 2 at 12:9-14, 81:13-15; 87:17-88:22; Canary-Garner Decl., ¶ 9 and Ex. 15; TAC, ¶¶ 5-7, 32; *Sateriale*, 697 F.3d at 783-84, 792.

[40] Vogt Decl., Ex. 2 at 66:19-67:4, 103:6-103:18; *id*., Ex. 9 at 95:24-96:7; *id*., Ex. 10 at 77:12-21; *id*., Ex. 8 at 149:14-22; *id*., Ex. 11 at 32:4-25; *id*., Ex. 7 at 57:11-18, 59:4-6; Canary-Garner Decl., Ex. 15.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

threshold than prior Camel Cash promotions.[41]  Per the final promotion's terms, adult smokers could redeem 1 art pack and 4 coupon books—or up 1125 C-Notes.[42] Every promotion since May 1999 limited the number of items per individual and/or per household that could be redeemed[43]—a fact plaintiffs concede.[44]

In response to Reynolds' offer, over 140,000 completed order forms were printed off the Camel brand website for art packs and/or coupon books. [45] Ultimately, over 27,000 adult smokers submitted completed order forms, and tendered over 21.4 million C-Notes, for rewards.[46]  This is consistent with the redemption statistics in 2005, as well as the period January 1, 2006 through September 30, 2006.[47]  That is, the number of adult smokers that participated in the final Camel Cash promotion coincides with the number of adult smokers that participated in Camel Cash promotions during the previous 21 months.  (*Id.*)

There is no competent evidence that Reynolds "offer[ed] only to redeem a tiny percentage of C-Notes" during the final Camel Cash promotion.  (OB at 9:11-13.)  Nor, was anyone "shit out of luck."[48]  Like every other Camel Cash promotion,

---

[41] Setchell Decl., ¶ 11; TAC, ¶ 29.

[42] Vogt Decl., Ex. 2 at 66:19-67:4, 103:6-103:18; Canary-Garner Decl., Ex. 15.

[43] Setchell Decl., ¶ 11.

[44] Vogt Decl., Ex. 5 at 51:22-52:4; *id.*, Ex. 6 at 31:24-32:12.

[45] *Id.*, Ex. 2 at 63:1-65:20; *id.*, Ex. 3 at 72:1-18, 77:18-23.

[46] *Id.*, Ex. 2 at 109:21-110:15; *id.*, Ex. 3 at 135:2-24; *id.*, Ex. 4.

[47] Setchell Decl., ¶ 13.

[48] Plaintiffs' assertion that Reynolds had a "tiny" budget for the final Camel Cash promotion, and less than 0.25% of the C-Notes issued would ultimately be redeemed, is a complete fabrication.  (OB at 7:7-12.)  The "budget," projections, and "shit out of luck" comment of which plaintiffs ascribe cosmic significance concerned a *proposed* promotion (known as "The Bank")—which would have converted C-Notes into a bar code—that was *never implemented*.  (Setchell Decl., ¶ 14.)  It had nothing to do with the final Camel Cash promotion.

the terms and conditions of the final promotion expressly provided that "supplies are limited."[49]   But *every* adult smoker that redeemed C-Notes per the final promotion's terms *obtained rewards*[50]—a fact that plaintiffs cannot dispute:

> Q.    Are you aware of a single instance of RJR refusing to provide merchandise during the final six months of the promotion for someone that tendered C-Notes per the program's terms and conditions?
>
> A.    No.[51]

Nor, did Reynolds ever tell "plaintiffs and/or class members it did not have any merchandise available for redemption" during the final promotion, as alleged in Paragraph 34 of the complaint.  ("Q. Ma'am, Reynolds never stated that to you, true? A. True.")[52]  At the end of the final promotion, Reynolds had *excess* rewards.[53]

Plaintiffs admit Reynolds had no obligation to them unless they redeemed C-Notes for rewards. ("Q.  And you understood that RJR had no obligation to you unless you tendered C-Notes for merchandise per the promotions terms, correct? … A. Correct.")[54] Every plaintiff that went to the Camel brand website during the final promotion saw that rewards were available. (OB at 14:8-16:9.) Yet, none of the plaintiffs redeemed C-Notes.[55]  Some plaintiffs never even looked

---

[49] Canary-Garner Decl., Ex. 15.

[50] Vogt Decl., Ex. 2 at 109:21-116:10; *id.*, Ex. 3 at 167:2-13; *id.*, Ex. 4.

[51] *Id.*, Ex. 5 at 13:11-17 (objection omitted).

[52] *Id.*, at 129:1-130:5; *id.*, Ex. 6 at 91:1-19 (conceding same).

[53] Setchell Decl., ¶ 12.

[54] Vogt Decl., Ex. 5 at 22:8-13.

[55] *Id.*, Ex. 3 at 153:6-153:11; 154:22-155:3; 154:5-10; 151:8-151:11; 156:10-16; 155:16-21; *id.*, Ex. 4; *id.*, Ex. 5 at 8:22-25; *id.*, Ex. 6 at 10:8-13; *id.*, Ex. 7 at 59:4-6; *id.*, Ex. 8 at 251:20-25, 95:5-104:5; *id.*, Ex. 9 at 112:18-24; *id.*, Ex. 10 at 81:15-19, 156:10-16; *id.*, Ex. 11 at 32:4-25.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

to see what Reynolds had offered during the final promotion.[56]  Some plaintiffs never redeemed a C-Note at any time.[57]

Because plaintiffs understood tobacco goods to be merchandise, they admit that they had no basis to claim that Reynolds failed to provide merchandise during the final promotion.  ("Q.  [A]re you aware of any facts to say that, as of October 1st, 2006, my client failed to provide any merchandise?  A.  No.")[58]  They also concede that Reynolds did not prevent them from redeeming C-Notes during the final promotion for the merchandise Reynolds had offered.  ("Q. As far as you know, there was no reason why you could not have redeemed your C-Notes for that -- for that merchandise [art packs and coupon books]?  A.  Correct.")[59]

## III.   <u>INDIVIDUAL FACT ISSUES ABOUND</u>

Plaintiffs were not exposed to a common set of communications. Javaheri did not begin participating in Camel Cash promotions "until the website came out,"[60] which was not until 2004.  Feinman and Dan Polese began in 1997; Wilson began in the "late '90s," and Heather Polese began in 2001-2002.[61]  None of the plaintiffs participated in the first two Camel Cash promotions.  (*Id.*)

Plaintiffs contend that, while Camel Cash promotions were in effect, Reynolds issued "more than twenty-five Camel Cash catalogs."  (OB at 3:20-22.) But Dan Polese "never got a catalog."[62]  Other plaintiffs saw only a fraction of them.

---

[56] *Id.*, Ex. 5 at 7:3-13; *id.*, Ex. 6 at 7:10-21; 12:17-25.

[57] *Id.*, Ex. 6 at 10:9-13; *id.*, Ex. 7 at 53:8-10.

[58] *Id.*, Ex. 6 at 84:25-85:3; *id*, Ex. 5 at 125:1-5 (same).

[59] *Id.*, Ex. 5 at 21:21-22:7; *id.* at 10:17-20 (same); *id.*, at 127:13-18 (same).

[60] Vogt Decl., Ex. 11 at 35:8-19, 102:10-102:24.

[61] *Id.*, Ex. 8 at 128:8-20; *id.*, Ex. 7 at 95:2-17; *id.*, Ex. 6 at 65:7-69:12; *id.*, Ex. 10 at 60:11-61:11.  Warren began in 1994/1995, but stopped participating in January 2001.  (*Id.*, Ex. 5 at 12:11-17, 22:14-20, 70:1-4, 147:23-148:5.) Holter claims he "enrolled" twice—in 1993 and 2000.  (*Id.*, Ex. 9 at 40:5-43:3.)

[62] *Id.*, Ex. 7 at 93:22-25.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

("Oh, man. I really don't remember.  Maybe like three or four, I would think.")[63]
Most of the catalogs were unfamiliar to plaintiffs.[64]  So too were the terms and
conditions, which most plaintiffs concede they never even read.[65]  They did not read
the order forms contained in the catalogs, either.  ("Q.  Did you ever read any of the
order forms?  A.  No.") [66]  Nor, did they follow instructions contained on C-Notes.[67]
Some plaintiffs acknowledged that Reynolds had the right to terminate a Camel
Cash promotion, at any time, without notice ("Q.  Was it your understanding that
Reynolds had the unqualified right to terminate the Camel Cash program without
notice? [] A. Yeah."). [68]  Other plaintiffs believed differently. [69]  But the latter
acknowledged that they did not read or remember the terms and conditions.[70]

Heather Polese testified that the C-Notes told her to "use," *not* save, them.[71]
Her husband, Dan, testified that those same C-Notes told him to do the *opposite*.[72]
And, when asked if he knew if his wife felt the same way he did, Mr. Polese

---

[63] *Id*., Ex. 6 at 28:13-21.

[64] *Id*., Ex. 11 at 69:6; 70:1; 74:17; 89:1-3.

[65] *Id*. at 10:4-25, 71:14-17; *id*., Ex. 9 at 52:12-21 [Holter never read them]; *id*.,
Ex. 7 at 131:6-14 [Dan Polese never read them ("Q.  Do you ever -- do you
remember reading the terms and conditions in the catalogs, sir?  A.  No, no, I
don't.")]; *id*., Ex. 6 at 15:23-16:9 [Heather Polese did not read them]; *id*., Ex. 5 at
43:1-13 [Warren might have read, but does not remember them]; *id*., Ex. 10 at
84:23-85:6, 92:20-95:4 [Wilson did not look for or remember them]; *id*., Ex. 8 at
124:21-125:8, 128:8-20, 205:18-206:8 [Feinman same].

[66] *Id*., Ex. 6 at 28:13-21.

[67] *Id*., Ex. 11 at 162:24-163:4.

[68] Vogt Decl., Ex. 5 at 120:3-25; *id*., Ex. 7 at 87:8-88:8; *id*., Ex. 8 at 227:3-
12 ; *id*., Ex. 11 at 91:4-22.

[69] *Id*., Ex. 9 at 63:9-22; *id*., Ex. 10 at 90:17-91:16.

[70] *Id*., Ex. 9 at 52:12-21; *id*., Ex. 10 at 84:23-85:6, 92:20-95:4.

[71] *Id*., Ex. 6 at 81:13-20; *see also id*., Ex. 5 at 104:11-111:4 (admitting same);
*id*., Ex. 11 at 168:15-169:4 (Javaheri same).

[72] *Id*., Ex. 7 at 122:21-125:24.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

explained:  "Each person is their own individual.  So, yeah, I actually don't know." (*Id*.)  Mr. Polese also disagrees with his wife (and the allegations in his own complaint) that his alleged "contract" with Reynolds was not for a specific item or good.  ("Q. So I think what you're saying, Mr. Polese, is that you viewed the Camel Cash program to be for a specific item or good?  A.  Correct.")[73]  He also disagrees with his wife and his other co-plaintiffs that cigarettes are merchandise.[74]  Thus, two married adult smokers, living in the same household, hold diametrically opposed views about what Reynolds communicated to them.[75]

Jackie Warren admits that she did not have any contract.  ("Q.  Do you believe that you had a contract with R.J. Reynolds?  A.  No.")[76]  Heather Polese believes she had a contract, but contrary to the Ninth Circuit's opinion, understood her obligations were limited to collecting C-Notes and being over 21 years old. ("Q.  Anything else that you were obligated to do under this contract besides collect C-Notes and be of the proper age?  A.  Not that I recall, no.  Q.  Did this contract obligate you to tender C-Notes for merchandise?  A.  No.")[77]

Because Reynolds had different legal responsibilities vis-à-vis tobacco and non-tobacco products—such as, for example, the payment of excise taxes on tobacco products, the satisfaction of state laws regarding shipment of tobacco products, etc.—Reynolds, internally, treated tobacco and non-tobacco products

---

[73] *Id*. at 50:17-20. The specific good that Mr. Polese wanted was a pool table. ("A.  I was saving for the pool table.")  (*Id*., at 18:3-18.)  That pool table cost 75,000 C-Notes, *see* Setchell Decl., ¶ 10, which he never came remotely close to possessing.  (Rossum Decl., Ex. 5.)

[74] *Id*., Ex. 7 at 134:3-15.

[75] The phone number that plaintiffs point to in their brief (1-877-CML-MERCH) (see OB at 3:27-4:1) appeared one time—in a catalog that was never published (*see* Setchell Decl., ¶ 19), which explains why plaintiffs have not come forward with evidence establishing that they had ever seen or called that number.

[76] *Id*., Ex. 5 at 43:14-16.

[77] *Id*., Ex. 6 at 33:6-34:3.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

1    differently. [78] In its external communications about Camel Cash promotions,
2    however, Reynolds did not make any distinction between the two.  (*Id*.)   In the
3    order forms, for example, tobacco and non-tobacco merchandise are listed together
4    under the column "Item Description."  (Squire Decl., Ex. B at 193.)   The order
5    forms also limited the number of "total items" that could be ordered—not the total
6    number of tobacco or non-tobacco items.  (*Id*.)

7        While some Camel Cash catalogs included $1.00 off pack coupons, *see id*.
8    at 185, Reynolds, prior to the final Camel Cash promotion, did not give all coupons
9    away for free.  (OB at 5:1-3.)   Instead, as the Camel Cash catalogs stated:  "Orders
10   for cartons [of cigarettes] from CA, IA, LA, RI and  certain other local communities
11   in other states, and where required by other circumstances, will be fulfilled with
12   store-redeemable coupons good for $20 off one carton of Camels."  (Squire Decl.,
13   Ex. B at 193.)  Moreover, in the 2002 "CML-Winter" promotion, Reynolds offered,
14   and more than 16,000 orders were placed for, coupon books—the third highest item
15   redeemed behind cigarettes (No. 1).  (Setchell Decl., ¶ 16 and Ex. 5.)  Thus, well-
16   before the final Camel Cash promotion, some individuals saved and redeemed
17   C-Notes for coupons for Camel cigarettes.  (*Id*.)

18       But people collected C-Notes for other reasons, too.  As plaintiffs admit,
19   "as the use of the internet grew in the late 1990s and the early 2000s people began
20   to trade or sell Camel Cash on the internet and on websites such as eBay.com."
21   (*See* TAC, ¶ 25.)  Thus, one the reasons people collected C-Notes was "to sell or
22   trade on eBay or other sites," *see* Squire Decl., Ex. G at 314, not to redeem for
23   rewards.   Even while this lawsuit was pending, Dan Polese traded "a couple
24   thousand" C-Notes for baseball cards, which he later sold for $25.00 (*see* Vogt
25   Decl., Ex. 7 at 113:6-114:14)—thus confirming that his particular C-Notes were not
26   "rendered worthless."  At the time he made that trade in 2011, Mr. Polese actually
27   believed that he could use C-Notes for Camel Cash rewards.  (*Id*., at 115:21-116:6.)

28       [78] Setchell Decl., ¶ 17.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

**LEGAL ARGUMENT**

**I.   PLAINTIFFS LACK STANDING**

A class action is an exception to the rule that litigation is conducted by and on behalf of the individual named parties only, *Comcast*, 133 S.Ct. at 1432, and a party seeking class certification 'must affirmatively demonstrate his compliance' with Rule 23." *Id*. Rule 23, however, is subject to the constitutional constraints imposed by Article III. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Thus, before undertaking review under Rule 23, a court must assess plaintiffs' standing. *Lierboe v. State Farm Mut. Auto Ins.*, 350 F.3d 1018, 1022 (9th Cir. 2003). Plaintiffs "must demonstrate, not merely allege, that they have suffered an injury-in-fact to establish Article III standing[.]" *Evans v. Linden Research, Inc.*, 2012 WL 5877579 (N.D. Cal. Nov. 20, 2012). Such injury must be "concrete and particularized, actual … and not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Plaintiffs fail to demonstrate injury-in-fact. Because plaintiffs did not redeem C-Notes "in accordance with the catalogs' terms," *Sateriale*, 697 F.3d at 787, 792, they do not have standing to assert the claims identified by the Ninth Circuit. Further, the assertion that plaintiffs were harmed because their C-Notes were "rendered worthless" is contradicted by their offer to prove that C-Notes had a value in the final promotion of $0.20 per C-Note. (OB at 8:7-9.) Each proposed class representative lacks standing, and the motion must be denied even without considering plaintiffs' failure to satisfy Rule 23. *Lierboe*, 350 F.3d at 1022-23.

Further, "no class may be certified that contains members that lack standing." *Mazza*, 666 F.3d at 594. But the class definition does not function to limit membership to only those who suffered harm. The class includes: (1) consumers who redeemed C-Notes; (2) thousands of persons who were no longer participating; and (3) consumers who were unaware of the types of rewards offered in the final promotion. Article III precludes certification of the proposed class. *Id*.

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

## II.  A CLASS MAY NOT BE CERTIFIED BASED UPON LEGAL THEORIES THAT WERE NEVER PLEADED

It is axiomatic that plaintiffs cannot certify a class based on theories and claims not pled in the operative complaint. *Brown*, 285 F.R.D. at 560.  *Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568, 571 (C.D. Cal. 2007) (denying certification where, as here, plaintiffs failed to amend the complaint to add new claims); *Bell v. Bimbo Foods Bakeries Distrib., Inc.*, 2013 U.S. Dist. Lexis 170663, at 33 n. 8 (N.D. Ill. Dec. 03, 2013) (failure to timely plead one of several breach of contract theories barred class certification on that theory).  But plaintiffs seek to do just that.  They seek certification based on the types of rewards offered, rather than Reynolds' allegedly "ceas[ing to] accept certificates for redemption." *Sateriale*, 697 F.3d at 782.  They seek certification based on *fictional* enrollment in the Camel Cash program, rather than on redemption of C-Notes in accordance with the catalog. *Id.* at 787.  As plaintiffs do not seek certification of the claims the Ninth Circuit found they alleged, class certification must be denied. *Anderson*, 554 F.3d at 528-29.

## III.  THE CLASS IS OVERBROAD AND NOT ASCERTAINABLE

An "'essential prerequisite'" to class certification is that "plaintiff must show by a preponderance of the evidence that the class is ascertainable." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 353 (3rd Cir. 2013) (citation omitted). Ascertainability "entails two important elements." *Id.* at 355.  First, "the class must be defined with reference to objective criteria." *Id.*  Second, "there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.*  Class certification also must be denied where the proposed class is overbroad because it includes unharmed members. *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).

The proposed class is not ascertainable by objective criteria; nor, have plaintiffs put forth an "administratively feasible" means—*i.e.*, "a manageable process that does not require much, if any, individual factual inquiry"—to identify

class members.  *Hayes*, 725 F.3d at 355 (citation omitted).  Plaintiffs propose a class of those who "enrolled" in Camel Cash.  (Proposed Order at 2:6-7.) But this criteria is *fictional*:  There was no enrollment in Camel Cash.  Nor, is there an administratively feasible means to discern those of the 600,000 individuals in Reynolds' smoker database that indicated a Camel brand preference *and* collected C-Notes, but did not participate in the final promotion because of the types of rewards that were offered, from those who did not participate because they: (1) had dropped out of the promotions; (2) never bothered looking to see what rewards were offered; or (3) did not have enough C-Notes to even participate.  Indeed, Reynolds' December 2005 consumer survey revealed that approximately 30% of those still participating in the promotion held 100 or fewer C-Notes.  Likewise, plaintiffs fail to propose any objective criteria for determining what class members purchased Camel cigarettes or saved C-Notes "so they could redeem C-Notes for [non-tobacco merchandise."  (OB at 3:10-13.)  Because "'class members are impossible to identify without extensive and individualized factfinding or 'mini-trial,' [] a class is inappropriate.'"  *Hayes*, 725 F.3d at 355; *Schwartz* , 183 F.R.D. at 667 (same).

The proposed class also is patently overbroad as it encompasses everyone in the United States that fictionally "enrolled" without regard to whether such individuals:  (1) collected C-Notes for the purpose of redeeming them for non-tobacco goods; (2) possessed a sufficient quantity of C-Notes to redeem for those rewards; and (3) looked to see what rewards Reynolds had offered in the final promotion.  Because plaintiffs do not provide an objective criteria for limiting class membership to those injured-in-fact (*see* Section I, *supra*), the class is overbroad.

## IV.   PLAINTIFFS FAIL TO SATISFY RULE 23(A)

Rule 23(a) requires plaintiffs to prove that there are sufficiently numerous parties, common questions of law or fact, typicality of claims and defenses, and adequacy of representation.  Fed.R.Civ.. 23(a) (1)-(4); *Dukes*, 131 S.Ct at 2551. These "four requirements … 'effectively limit class claims to those fairly

1    encompassed by the named plaintiffs claims.'"" *Id.* at 2550 (citations omitted).

2        A.    **Plaintiffs Fail to Establish Numerosity**

3        "A party seeking class certification must . . . be prepared to prove that there

4    are *in fact* sufficiently numerous parties . . . ." *Id.* at 2551. "Mere speculation as

5    to the number of class members—even if such speculation is 'a bet worth

6    making'—cannot support a finding of numerosity." *Hayes*, 725 F.3d at 357

7    (citation omitted). Plaintiffs assert that there are over 600,000 "enrollees" identified

8    by Reynolds records. (OB 12:2-9.) Not true. (*See* Setchell Decl.,¶¶ 4-5.) Because

9    there was no enrollment, there were no "enrollees," and the proposed class is a null

10   set. Plaintiffs fail to put forth evidence that there are "*in fact*" any other consumers

11   who did not redeem C-Notes who could and would have done so had non-tobacco

12   merchandise been made available as a reward during the final promotion.

13   Thus, they have failed to carry their burden on the issue of numerosity.

14       B.    **Plaintiffs Cannot Satisfy The Commonality Requirement**

15       Rule 23(a)(2)'s commonality requires plaintiffs "to demonstrate that the class

16   members 'have suffered the same injury'" and that class members' claims

17   "depend upon a common contention." *Dukes*, 131 S. Ct. at 2551. "That common

18   contention, moreover, must be of such a nature that it is capable of classwide

19   resolution—which means that determination of its truth or falsity will resolve an

20   issue that is central to the validity of each one of the claims in one stroke." *Id.*

21       Plaintiffs do not and cannot demonstrate that all class members have suffered

22   *any* injury, let alone a common injury. The tens of thousands of adult smokers that

23   participated in the final promotion are not similarly situated to those that did not

24   participate. Those that did redeem obtained a value of $0.20 per C-Note. Those

25   that wanted to participate, but did not have enough C-Notes to do so, suffered no

26   injury. And, those that had enough C-Notes to participate, but chose not to redeem,

27   suffered a self-inflicted wound. Moreover, most holders of C-Notes were no longer

28   participating in Camel Cash promotions—regardless of the types of rewards

1   Reynolds offered—and were not going to redeem for a myriad of individual reasons.
2   Plaintiffs imply that a maximum of 40% of C-Notes could be expected to be
3   redeemed during the final promotion, *see* OB at 5:16-19, meaning that the majority
4   of C-Notes (*i.e.*, the other 60%) were *never* going to be redeemed.   Furthermore,
5   those that collected C-Notes to redeem for tobacco merchandise could not have
6   suffered any, much less a common, injury as those that collected for non-tobacco
7   goods.  The same is true for individuals that collected C-Notes to "buy and trade on
8   eBay or other sites."   Because plaintiffs have not demonstrated a common injury,
9   they have not satisfied the commonality requirement.

10      Plaintiffs also fail to establish common contentions and common answers.
11   Instead, plaintiffs treat commonality as a mere formality—listing open-ended *what*
12   and *how* "reporters' questions." (OB at 12:10-22.)  Plaintiffs identify only two of
13   their proposed common questions as "core" to the case—(1) how a reasonable
14   person would interpret Reynolds' "offers," and (2) the scope of Reynolds'
15   discretion as to what types of rewards it could offer. (*Id.* at 12:13-15.)  Neither is a
16   *contention* the "truth or falsity" of which can be tested, let alone answered, in
17   "one stroke" of the pen.  *Dukes,* 131 S. Ct at 2551.   Even among the named
18   plaintiffs, there are not even "common answers" to the "core questions."  Dan and
19   Heather   Polese—two   married   adult   smokers—have   entirely   different
20   "interpret[ations] [of] RJR offers and the scope of RJR's discretion as to what items
21   it could offer to be redeemed for C-Notes[.]"   Furthermore, as plaintiffs' reference
22   to "offers" in the plural underscores, there was not a uniform set of communications
23   made to all proposed class members over the 16 years that Camel Cash promotions
24   were conducted.   The Ninth Circuit recognized that whether an offer existed
25   depended   upon   "the   totality   of   the   circumstances   surrounding   RJR's
26   communications to consumers." *Sateriale*, 697 F.3d at 787-788.  The existence of
27   an offer and other contract formation issues pose individual issues that have neither
28   class wide proof or answers. (Section V, *infra*.)

Nor does plaintiffs' question regarding the scope of the alleged limitations on Reynolds' discretion present a common contention.  Plaintiffs argue that Reynolds' discretion is limited by the implied covenant of good faith and fair dealing, *see* OB at 2, which plaintiffs contend would be governed by the purportedly uniform laws of each local jurisdiction.  (*Id*. at 19-20.)  But plaintiffs do not and cannot make a showing that the laws governing the implied covenant are common.  They are not.  (*See* Section V(B), *infra*.)   In any event, the implied covenant presupposes the existence of a contract, which cannot be determined by common class-wide proof.[79]

## C.   Plaintiffs' Claims Are Not Typical

"The premise of the typicality requirement is simply stated:  as goes the claim of the named plaintiff, so go the claims of the class." *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 412 (C.D. Cal. 2000) (citation omitted).  "Where this premise does not hold true, class treatment is inappropriate." *Id*.  The test of typicality is "whether other [class] members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011).  Furthermore, typicality does not exist "'where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" *Quezada*, 2009 WL 5113506, at * 3 (citations omitted).

---

[79] The remainder of plaintiffs' purportedly common questions fail for several additional reasons.  They are not contentions the "truth or falsity" of which can be established. *Dukes*, 131 S. Ct. at 2551.  Moreover, as plaintiffs tacitly admit, they are not core questions with "common answers" that will drive resolution of the case. *Id*.  Instead, they are just the sort of superficial questions that *Dukes* recognizes can easily raised "in droves" but which do not satisfy commonality. *Id*.  The answers to these questions will be different, as demonstrated by the divergent testimony of the named plaintiffs, for everyone in the proposed class.  Put simply, just because one individual saw a particular catalog or C-Note, or held a particular expectation, is not probative of whether anyone else did.

24

There is not a common injury among the class, let alone among the named plaintiffs.  (*See* Section IV(B)(1), *supra*.)  Jackie Warren and Heather Polese did not even bother to look to see what rewards Reynolds offered during the final promotion—hence, it would not have mattered to these plaintiffs if Reynolds had offered non-tobacco merchandise as rewards because they would not have participated anyway.  Moreover, plaintiffs, who supposedly saved C-Notes to redeem for non-tobacco rewards could not have "the same or similar injury" as the members of the proposed class that (1) had ceased participating in Camel Cash; (2) collected C-Notes for tobacco merchandise or some other purpose; or (3) participated in the final promotion.  Thus, plaintiffs' claims do not align with those of the proposed class—the essential "purpose of the typicality requirement." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Plaintiffs must, but fail to, establish that the defenses to their claims are typical to the defenses against absent class members claims.  *Cholakyan*, 281 F.R.D. at 556.  "[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality…." *Id*. at 557 (citation omitted).   In contrast to thousands of others, none of the plaintiffs redeemed C-Notes "in accordance with the catalogs' terms," and cannot proceed on the contract and promissory estoppel theories identified by the Ninth Circuit.

## V.   **PLAINTIFFS CANNOT SATISFY RULE 23(B)(3)**

Predominance is a "far more demanding [standard] than the Rule 23(a)(2) commonality requirement," *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 144 (3d Cir. 2001), and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623.   The answers to key questions of fact and law common to the entire class must "predominate over any questions affecting only individual members." *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 946 (9th Cir. 2011).   To satisfy Rule 23(b)(3), plaintiffs are required to show, with *evidence*, that their claims are subject to class wide proof,

*Comcast*, 133 S. Ct. at 1432, a standard plaintiffs do not and cannot meet.

### A.     <u>Individualized Issues of Fact Predominate</u>

Plaintiffs' claims are plagued by individualized issues of fact—to wit:

    **1.**     *Whether an offer was made to each putative class member?*
As plaintiffs' reference to "offers" in the plural underscores, *see* OB at 18:21, there was no single offer. Camel Cash was a series of individual promotions, each with a catalog, which specified the promotion's terms and conditions. The absence of a common contract precludes certification. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (where no common contract exists, the "elements of each class member's claim" cannot then be proven by "identical evidence" but instead depend upon "individualized facts and circumstances").[80] Plaintiffs make no showing that any of the putative class members ever saw or read any of the catalogs in the first instance. Plaintiffs themselves saw very few of them, and remembered little, if anything, about their terms and conditions. Even if a class member saw a catalog, there would be the further individual questions of whether they saw *enough* catalogs or participated in the promotions long enough to conclude that similar merchandise would always be offered in future promotions. (*See* OB at 7:16-18 (arguing that reasonable expectations frustrated because Reynolds offered "merchandise" for 15 years). A class member that read only one catalog in 1991 would not be in a position to infer that the same rewards would be offered in 2006. Even as to class members who had seen five or more catalogs, those communications were not uniform. Plaintiffs allege that "certain (but not all)" of the catalogs allowed for termination without notice, TAC ¶ 32, which the Ninth Circuit found could defeat the existence of an offer. *Sateriale*, 697 F.3d at 790-792.

---

[80] *See also Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998) ("Plaintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts"); *Campusano v. BAC Home Loans Servicing LP*, 2013 WL 2302676, at *6 (C.D. Cal. Apr. 29, 2013) (lack of common agreement "would lead to a host of individual questions regarding the underlying validity of [such] agreements").

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

**2.     *Was each class member still a smoker?*** In order to participate in any Camel Cash promotion—including the final one—a consumer needed to certify on the order form that they are a "smoker" or "tobacco consumer." (Squire Decl., Ex. B at 10-228.) By their terms, the catalog offers preclude anyone that quit smoking from participating—a fact that begets individual inquiry.

**3.     *Was each class member still participating in Camel Cash?*** The evidence shows that hundreds of thousands of putative class members suffered no injury because, for a variety of reasons, they had ceased participating in Camel Cash well before the final promotion, and were unlikely to participate after 2005. The only way to differentiate between those who did not participate in the final promotion because of the types of rewards that were offered from those who did not participate because they had effectively dropped out of the program (because, for example, they stopping smoking cigarettes) is to make individual inquires.

**4**.     ***Would each putative class member who did not redeem C-Notes during the final promotion have redeemed them if the same types of rewards had been offered?*** The basic assumption of plaintiffs' motion is that each putative class member would have redeemed their C-Notes had the same or similar menu of rewards been offered in the final promotion as had been previously offered. There is no basis for such a class wide assumption. Every holder of Camel Cash had the opportunity to redeem their C-Notes in the months and years before the final promotion for such rewards, and the vast majority did not do so. Reynolds provided notice of the end of the program in mid-September 2016, well before October 1, 2006. That class members received that notice, but did not attempt to redeem C-Notes for non-tobacco merchandise in September 2006, strongly suggests that they would not have redeemed even if the same reward mix had been offered in the final promotion. Determining whether each putative class member would have acted differently and redeemed his or her C-Notes if the same rewards had been offered is individual specific inquiry.

**5.**      ***Was each putative class member actually saving C-Notes for non-tobacco merchandise?***      Plaintiffs argue that each putative class member "collected C-Notes to redeem for merchandise," OB at 13:10-13, and seek to represent a class of persons who enrolled in Camel Cash "so they could redeem C-Notes for merchandise." (*Id*. at 3:12.) But there is no basis to assume that even those still participating in the promotion were saving C-Notes for non-tobacco rewards. Cartons of cigarettes were the second most redeemed item during the course of the promotions, and the most highly rated item for future reward offerings. That many smokers would want to redeem for cigarettes makes common sense. (Vogt Decl., Ex 6 at 56:21-23 ("Smokers looking at getting free smokes. There you go.") Plaintiffs admit that some class members were saving C-Notes to redeem for cigarettes. (OB at 6:23-24, n. 9.) Some plaintiffs redeemed C-Notes for cigarettes during the promotion. And, tens of thousands of putative class members actually redeemed for cigarettes or coupons for cigarettes during the final promotion. The core question of what type of reward each putative class member was saving C-Notes for (if anything) can only be determined by individual inquiry.

**6.**      ***What were the actual expectations of each putative class member?***      Plaintiffs argue that each putative class member enrolled in Camel Cash "with the reasonable expectation" that they could redeem C-Notes for non-tobacco merchandise. (OB 2:14-18.) Likewise, plaintiffs argue that when consumers "joined the Program," they had had the reasonable expectation that Reynolds would provide "reasonable quantities of [non-tobacco] merchandise." (*Id*. at 7:13-16.) Proving these assertions requires not only inquiry into whether the expectation was reasonable, but whether each putative class member actually had the same expectation in the first instance. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718 735 (9th Cir. 2007) (affirming district court's ruling that individual issues predominated; court "would have to ascertain each individual's expectations about the contract, and determine whether those expectations were reasonable");

**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

*Bushbeck v. Chi. Title Ins. Co.*, 2011 U.S. Dist. LEXIS 158134, at \*40-41 (W.D. Wash. Aug. 15, 2011) ("key issues regarding contract formation and the class members' reasonable expectations will require individualized proof" and that individual questions will "predominate over the common questions"); *Yarger v. ING Bank FSB*, 285 F.R.D. 308, 329 (D. Del. 2012) ("The multitude of individualized issues present in proving reliance [on a promissory estoppel clam] would entail complicated mini-litigations focusing on the individual class members' knowledge and state of mind.").

**7.** ***Did each putative class member have the same understanding of the terms of the alleged offer and promise?*** Plaintiffs assert that how Reynolds' alleged offers would be interpreted presents a common question. (OB at 12:13-14.) Not so. Plaintiffs admit that *every* term of the alleged contract was set forth *in writing* in the catalogs. Yet, none of the catalogs stated that there would always be non-tobacco merchandise offered as rewards. Thus, there cannot possibly be reasonable expectations in the face of written terms that say there cannot be any. And, whether anyone inferred—let alone could have reasonably done so—from prior catalogs that such a promise or offer had been made is fundamentally an individualized question. And, even if plaintiffs wanted to rely upon extrinsic evidence to add to or vary the written terms of a catalog, there is no uniformity among the 50 states on that issue. *Lane v. Wells Fargo Bank, NA.*, 2013 WL 3187410 at \*4 (N.D. Cal. June 21, 2013) ("variations in state law" regarding breach of contract "swamp any common issues and defeat predominance"); *CLN Props., Inc. v. Republic Servs., Inc.*, 2010 WL 5146734, at \*7-8 (D. Ariz. Dec. 13, 2010) (denying certification because plaintiffs had not demonstrated that state law was uniform with respect to admissibility of extrinsic evidence).

**8.** ***Did each putative class member have enough C-Notes to redeem for any particular item, if any, that they were saving C-Notes for had it been offered?*** As plaintiffs admit, some class members were saving for particular

expensive items for which they did not have enough C-Notes to obtain.   For example, Dan Polese was saving C-Notes for a pool table.   In the penultimate promotion, a pool table was priced at 75,000 C-Notes—an amount that Mr. Polese did not come remotely close to possessing.   Thus, he could not have obtained the pool table even if it was offered as a reward during the final promotion, and hence, he suffered no actual harm from that item not being available.   The identities of others who were saving for "expensive" items, but did not have enough C-Notes to redeem for those rewards, can only be determined through individual examination.

**9.   *How many C-Notes did each putative class member hold?*** Untold numbers could not have been injured because they did not hold at least 200 C-Notes on September 30, 2006—the minimum number needed to participate in the penultimate promotion.   That inquiry is not subject to class wide proof.

**10.   *Why did numerous class members print out, but not submit, order forms?*** Approximately 140,000 order forms were printed during the final promotion, yet 34,890 were submitted.   Why any class member printed an order form, but did not submit it for rewards, is an individual issue.   One obvious reason for that failure is that, after they printed the order form, they realized that they did not have enough C-Notes to participate.

**11.   *Did each putative class member intend to contract with Reynolds?*** Plaintiffs assert that the most important common question is whether a reasonable consumers would interpret Reynolds' communications as offers to contract.   (OB at 18:29-21.)   But some class members, like Jackie Warren, did not believe they had contract with Reynolds at all.   Intent to contract is material to both contract formation and materiality.   *Sateriale*, 697 F.3d at 789-790.   Individual inquiry is the only way to discern who did and who did not intend to contract.

**12**.   ***Did each putative class member have the same understanding of "merchandise?"*** Plaintiffs have gone to great efforts to recast their contract theory as to Reynolds' obligation to make "merchandise" available as a reward, and

that "merchandise" does not include cigarettes or coupons for cigarettes.  But five of the seven plaintiffs understood "merchandise" to include cigarettes.  Differing understandings of whether "merchandise" includes tobacco products cuts to the core of plaintiffs new theory.  Each putative class members' understanding of the terms of the alleged contract can only be assessed by individual inquiry.

   **13.** ***Whether each putative class member accepted the alleged offer by redeeming C-Notes?*** The core issue of whether a contract was formed with each of the class members requires individual inquiries.  Although plaintiffs argue that they accepted an offer to contract by "enrolling" in Camel Cash, *see* OB at 1:12-13, this is not the terms of the offer that the Ninth Circuit allowed plaintiffs to proceed upon.  The performance the Ninth Circuit required was "redeem[ing C-notes] in accordance with catalogs' terms." *Sateriale*, 697 F.3d at 787.  Whether each class members did so (or attempted to do so) cannot be ascertained by class wide proof.

   **14.** ***Whether each putative class member believed they had registered for or enrolled in Camel Cash?*** Plaintiffs argue that they seek to "represent a class who accepted RJR's offer by enrolling in the Camel Cash program." (OB at 1:12-13.) Whether each class member erroneously conflated their registration in the Reynolds' database with "enrollment" in the "program" would require individual inquiry into whether each class member believed that they were enrolling in the program.

   **15.** ***Whether each class member relied on the alleged promise.*** Whether all class members relied on an alleged promise to have non-tobacco merchandise available is not a matter of class wide proof. *Desai v. Deutsche Bank Secs., Inc.*, 573 F.3d 931, 942 (9th Cir. 2009) (concluding individual issues of reliance predominated where no presumption of reliance applied); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665 (9th Cir. 2004) (concluding class certification inappropriate because claims against gaming manufacturers and operators implicate "individualized reliance issues related to plaintiffs' knowledge,

motivations, and expectations"); *Martin v. Dahlberg, Inc.*, 156 F.R.D. 207, 217 (N.D. Cal. 1994) (same).  Unquestionably, there are class members that purchased Camel cigarettes for reasons unrelated to Camel Cash promotions (*e.g.*, they liked to smoke Camels).  Whether and why putative class members were saving C-Notes is an individual question.  Class members, like Jackie Warren, who were aware that each catalog had an expiration date and of Reynolds' unqualified right to terminate could not have reasonably relied on the belief that any rewards, let alone any particular types of rewards, would be made available in the future.

**16.** ***Was there a breach as to each potential class member?*** Individual inquiry is required to discern the existence of a breach of contract. Dan Polese testified that his contract was for a specific item.  His wife testified that the contract was not for a specific item, and that Reynolds was obligated only to provide "merchandise."  But when asked, "are you aware of any facts to say that, as of October 1st, 2006, my client failed to provide any merchandise?" she answered "No."  Jackie Warren did not even believe she had a contract.

**17.** ***Whether each putative class member was harmed by the alleged breach?***  Whether each putative class member was harmed will require individual inquiries.  Like some named plaintiffs, were they unaware of the final promotion and the types of rewards Reynolds offered?  If so, they were not harmed. Did they redeem C-Notes during the final promotion?  If so, they were not harmed. Did they collect C-Notes for tobacco goods?  If so, they were not harmed.  Did they collect C-Notes to "buy or trade on eBay or other sites?  If so, they were not harmed. Most class members were not going to redeem for a myriad of individual reasons, which is confirmed by plaintiffs' argument that a maximum of 40% of C-notes were be expected to be redeemed, OB at 5:16-19, meaning that the majority (the other 60%) were never going to be redeemed, and hence their holders were not harmed.

**18.** ***Damages require individualized determinations.***  Plaintiffs contend that, during the final promotion, C-Notes were both "worthless" and had a

value of $0.20. Both cannot be correct. If they had a value of $0.20, no one was injured. If they were "worthless," plaintiffs have failed to put forth an alternative damages model, and hence, have failed to carry their burden. *Comcast,* 133 S. Ct. at 1433. Nor, have plaintiffs offered any proof that the redemption value of a C-Note for class members who redeemed for an item that other class members did not want is an appropriate class wide measure of damages. That theory assumes that the value of the C-Note was a function of the value of reward for which the C-Note was redeemed. There is no evidence that reward items were priced proportional to their actual cost or dollar value. This would pose an individual question as to what reward a class member wanted, its value, and the number of C-notes that would be charged for it. Likewise, plaintiffs present no evidence regarding the value of C-Notes before the alleged breach, that the value would be the same for all class members, or that the value of C-Notes *declined* in the final promotion. These require individual inquiry. *Comcast,* 133 S. Ct. at 1433 (no class can be certified "where plaintiffs cannot provide a method for computing damages that takes into account all pertinent differences [among] the putative class members").

**19.** ***Did each putative class member receive notice?*** Plaintiffs' motion insinuates that Reynolds did not provide adequate notice. (OB at 7:5-9.) Of course, whether an individual class member received notice (directly from Reynolds or from word of mouth) can only be determined by individual inquiry.

**B.    Varying State Laws Destroy Predominance, Manageability And Superiority**

It plaintiffs' burden to show uniformity, manageability and superiority. *In Re Paxil*, 212 F.R.D. at 546. They failed to do so.

**1.    Breach of Unilateral Contract**

Plaintiffs merely attach "Schedule A" to their brief. But that document does little more than cite one or two cases from each state containing general definitions of a unilateral contract. Plaintiffs do not analyze the elements of the claim in each

state, the burdens of proof, the statutes of limitations (and discovery rule), whether extrinsic evidence is allowed, etc.  Nor, do plaintiffs attempt to show that there are not material or unmanageable differences in state law, *Schwartz*,  183 F.R.D. at 679, which there are.  *Gustafson*, 294 F.R.D. at 544-547 (denying class certification due to material differences in 50 state's laws regarding contract interpretation, use of extrinsic evidence, statutes of limitation, and defenses, and cataloging cases holding the same); *see also* Rossum Decl., Exs. 1-2.  Indeed, New York (where Feinman is located) and Ohio do not even recognize customer rewards programs as offers to contract.  *Sateriale*, 697 F.3d at 785-786 (declining to follow *Leonard v. Pepsico, Inc.*, 88 F.Supp.2d 116, 122-27 (S.D.N.Y. 1999) and *Alligood v. Procter & Gamble Co.*, 594 N.E.2d 668, 668-70 (Ohio Ct. App. 1991 (per curiam)).  Some states allow the revocation of an offer for a unilateral contract at any time.  Rossum Decl., Ex. __. These material differences in state law "compound the disparities among class members," *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1184, (9th Cir. 2001), and put this Court to "the impossible task of instructing the jury on the relevant law." *Chin v. Chrysler Corp.*, 182 F.3d 448, 453 (D. N.J. 1998); *Marsh v. First Bank of Delaware*, No. 11 CV-05226, 2014 WL 554553, *14 (N.D. Cal. Feb. 7, 2014) ("It may very well be the case that all applicable state laws are nearly identical with California's . . . but it is [plaintiff's] burden to show this, and she has not does so.  Accordingly, the proposed nationwide classes fail.").

## 2. <u>Promissory Estoppel</u>

Plaintiffs make no attempt to identify or analyze the applicable laws of the 50 states for their promissory estoppel claim.  (OB at 20-21 (discussing California law only).)  Some states do not even recognize promissory estoppel as a cause of action.  *Home Electric Co. v. Hall & Underdown Heating & Air Conditioning Co.*, 86 N.C. App. 540, 543 (1987).  And, in those states that do, the elements vary widely in nature and degree.  (Rossum Decl., Ex. 3.)

### 3.     Breach of Implied Covenant

Plaintiffs make no attempt to identify or analyze the applicable laws of the 50 states for breach of the implied covenant.  For good reason:  The dizzying array of state law variations regarding the scope and applicability of the implied covenant raises so many individual legal and factual issues that district courts uniformly refuse to certify nationwide class actions asserting such claims.  *Gustafson*, 294 F.R.D. at 547-48 (denying class certification and cataloging cases holding same). In some states, a plaintiff must first establish a breach of an express term of the contract to bring an implied covenant claim.  *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992) (Illinois law).  Some, but not all, states require proof of a special relationship between the parties. *AAMCO Transmissions, Inc. v. Wirth*, 2011 WL 6088671, at *11 (E.D. P.A. Dec. 7, 2011) (Pennsylvania law). State laws vary "as to whether intent is an element of an implied covenant claim and, if so, what intent must be proven." *Yarger*, 285 F.R.D. at 325.  States disagree as to "whether the standard for good faith is subjective or objective and whether and to what extent the implied covenant constrains discretion expressly granted to one party by the contractual terms." *Lane*, 2013 WL 3187 410, at *4.  *See*, *e.g.*, *Brill v. Catfish Shaks of Am., Inc.*, 727 F. Supp. 1035, 1041 (E.D. La. 1989) (subjective standard in Louisiana). Thus, individualized evidence as to subjective intent would be relevant to the claims of some putative class members.  This "multitude of different state law standards" would make a class wide trial of an implied covenant claim unmanageable. *Lane*, 2013 WL 3187 410, at *4; Rossum Decl., Ex. 4.

### CONCLUSION

The motion for class certification should be denied.

Dated:  July 21, 2014                               JONES DAY

By:  */s/ John A. Vogt*
      John A. Vogt
ATTORNEYS FOR DEFENDANT